UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Tiger Team Technologies, Inc., f/k/a
Blackwater Technologies, Inc.,
a Nevada Corporation,

                Plaintiff,

  v.

Synesi Group, Inc., f/k/a Portogo, Inc.,
a Minnesota Corporation; Tim Olish;
and Rod Miley,

                Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civ. No. 06-1273 ADM/AJB

_____

Boris Parker, Esq., Parker & Wenner, P.A., Minneapolis, MN, argued on behalf of Plaintiff.

Robert Zeglovitch, Esq., Law Offices of Robert Zeglovitch, Minneapolis, MN, argued on behalf of Defendants Tim Olish and Rod Miley.
_____

## I. INTRODUCTION

This matter is before the undersigned United States District Judge on Defendants Tim Olish ("Olish") and Rod Miley's ("Miley") Motion for Summary Judgment [Docket No. 95]. In its Second Amended Complaint [Docket No. 82], Plaintiff Tiger Team Technologies ("T3") asserts claims for breach of contract, promissory estoppel, deceptive trade practices, unfair competition, fraud, and negligent misrepresentation. In an Order dated January 14, 2008 [Docket No. 65], the Court dismissed the deceptive trade practices, unfair competition, and negligent misrepresentation claims against Miley and Olish. For the reasons set forth below, Miley and Olish's Motion for Summary Judgment is granted on the remaining claims.

## II. BACKGROUND[1]

T3 is a Nevada corporation with its principal place of business in California. 2d Am. Compl. ¶ 1. T3 formerly was known as Blackwater Technologies, Inc. ("Blackwater") until October 11, 2006. Id. ¶ 6. Paul Hogan ("Hogan") is the company's sole director and only officer. Id. ¶ 9. Synesi Group ("Synesi"), formerly known as Portogo, Inc.,[2] is a Minnesota corporation. Id. ¶ 10. Synesi, which has not conducted business operations since the summer of 2006, owned process patents for the bonding and insuring of data transmitted through the internet. Parker Aff. [Docket No. 111] Ex. A (Miley depo. at 33-34); Olish Aff. [Docket No. 98] ¶ 2. Olish is a Minnesota resident who was a member of the board of directors for Synesi from 2003 until the present and also served as its president. Id. Olish owned a 2% share in the company. Id. ¶ 3. Miley is a Minnesota resident and has served on the board of directors for Synesi since 2001. Miley Aff. [Docket No. 99] ¶ 2. He also served as Chief Executive Officer ("CEO") of Synesi during 2004 and part of 2005. Id. Miley owned a 4.67% share in the company.

During 2004 and 2005, Synesi was pursuing the patent applications. Olish Aff. ¶ 6. It received notice of allowance of claims for one of the patents in August 2004. Id. Throughout 2004, Synesi worked to accelerate patent claims through the Patent and Trademark Office and was granted its first patent in July 2005. Id. During this same period, Synesi began looking for business partners who might apply the technology covered by the patent. Id. Olish and Hogan

---

[1] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

[2] The Court will use Synesi when referring to both Synesi and Portogo.

discussed the possibility of Synesi hiring Hogan as a consultant to help Synesi write a business plan to market the technology. Hogan Aff. [Docket No. 110] ¶ 3. Miley, Olish, and Hogan met in June 2004 to discuss how they might get a developed product to the marketplace. Id. This was the first time Hogan met Miley. Parker Aff. Ex. C (Hogan depo.) at 111. Synesi did not ultimately hire Hogan as a consultant because Marcellus Knoblach ("Knoblach"), the major investor in Synesi, objected to paying for Hogan's services. Id. at 113-14.

On July 10, 2004, following a phone call from Olish, Hogan sent Synesi a business plan for a medical transcription business concept. Parker Aff. Ex. 25. Hogan then sent an email to Olish on July 29, 2004 in which he stated:

> The following is my understanding of what was agreed to in our discussions Tuesday last.
>
> Tiger Team Technologies and the Synesi group have agreed to an exclusive license and or rights to the e-transaction [Synesi] processing technology all e-file services Tiger Team provides to the medical and dental industries. This license is understood to to (sic) be universal and worldwide. In consideration [Synesi] will receive as yet to be determined royalty per transaction.

Id. Ex. 26. Three days later, Hogan sent Olish another email stating "I do need to firm up some things with you and [Synesi]. There may be a reason for a much broader relationship I would like to explore." Id. Hogan testified that among the items he needed to "firm up" were "licensing and deliverables and marketing." Hogan depo. at 220. There was no draft of a licensing agreement at that time. Id. at 224. Shortly after sending these communications, Hogan purchased a shell company for $245,000 that became T3 for the purpose of a public stock offer to raise funds for the venture. Hogan Aff. ¶ 10.

On August 4, 2004, Olish and Hogan met with a company specializing in health care

3

privacy compliance, and shortly thereafter, Hogan informed Olish that he was "telling the street that these deals are in place." Parker Aff. Exs. 27, 28.  He also told Olish, "I know the verbal is good but I have to nail it down corporately." Id. Ex. 28.  Olish informed Miley that the original U.S. patents had been allowed on August 12, and Hogan sent Olish another email on August 17 stating, "we need to obtain [a substantive agreement], letter of understanding [or] something in writing. Id. Exs. 29, 30.  He concluded by asking Olish for "a time frame for when I can expect to see the [Synesi] licensing agreement." Id. Ex. 30.  Three days later Hogan asked Olish: "Any news on the final draft of the licensing agreement?" Id.

Olish's notes from September 2004 identify T3 as a "lead candidate" for a business relationship. Id. Ex. 24.  Also in September, Synesi's board of directors called a special meeting after Knoblach informed Miley of his intention to call due over $3 million in unpaid principal and interest on loans his trust made to Synesi. Id. Ex. 33.  Because Synesi lacked the capital to pay back these loans, Miley and Olish recommended that Synesi attempt to negotiate a standstill agreement with Knoblach to prevent Knoblach from foreclosing on the patents. Id.  Hogan was never informed about this development. Hogan Aff. ¶ 18.

On October 15, Olish sent Hogan an email marked as a "confidential draft" in which he discusses the "strategic relationship" between T3 and Synesi. Parker Aff. Ex. 36.  Olish states that Synesi planned to give T3 exclusive rights to Synesi's process in the medical services field but that issues needed "to be finalized prior to a licensing agreement being completed." Id.  Hogan characterized this email as an attempt "to finalize the agreement." Hogan depo. at 86.  Hogan also testified that he never received a term sheet from Synesi. Id. at 87.  The parties never reached an agreement as to price or the specific circumstances under which the licensing

agreement could be terminated and the process for doing so.  Id. at 104-05.  For the next two months, the parties continued to discuss the project status.  Olish depo. at 205-06.

On December 14, Olish wrote an initial draft of a letter from Synesi to Hogan outlining some areas of concern regarding public representations about the relationship between T3 and Synesi.  Parker Aff. Ex. 43.  In this draft letter, Olish states that it "needs to be clear that there is a licensing agreement in place between Synesi and T3."  Id.  The letter also raises concerns that T3 is representing that it owns Synesi's patents.  Id.  Before finalizing the letter and sending it to Hogan, Olish sent the draft to Synesi's attorney Larry Ingwersen.  Id.  On December 21, Olish sent Hogan a final copy of the letter with somewhat different language.  Id. Ex. 44.  Specifically, the letter informs Hogan that until the agreement is in place, "both companies need to make sure that our documents, websites, etc. clearly articulate a pending licensed reseller relationship."  Id.

Throughout the remainder of December and into early January, Hogan and Olish continued to exchange emails about representations made to the public.  Hogan depo. at 182-84.  On January 13, 2005, Synesi sent a letter to Hogan advising him that effective immediately, Synesi would be ceasing all communications with T3.  Parker Aff. Ex. 49.  Synesi cited the fact that its "informal communications with T3 have[] resulted in several erroneous external communications; and negatively impacted [its] primary mission."  Id.

T3 commenced this action in March 2006.  Compl. [Docket No. 1].  In October 2007, Miley and Olish moved for judgment on the pleadings.  The Court dismissed a number of claims but allowed T3 to proceed with its claims of breach of contract, fraud, and promissory estoppel against Miley and Olish.  Jan. 14, 2008 Order at 14.  Also, the Court required T3 to file materials demonstrating that it was the real party in interest.  Id.  T3 did so and the Court denied without

prejudice Miley and Olish's objection regarding T3's status as the real party in interest. Mar. 28, 2008 Order [Docket No. 81] at 6. The parties have completed discovery, and Miley and Olish move for summary judgment.

### III. DISCUSSION

**A.      Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.      Piercing the Corporate Veil**

As a threshold issue, Miley and Olish argue that they cannot be held individually liable for breach of contract and promissory estoppel because they were acting as agents of the corporation and T3 cannot demonstrate that the Court should pierce the corporate veil. A court may pierce the corporate veil when the corporation is an alter ego or mere instrumentality of an individual shareholder. Victoria Elevator Co. of Minneapolis v. Meriden Grain Co., Inc., 283

N.W.2d 509, 512 (Minn. 1979). When applying this doctrine, "courts are concerned with the reality and not form, with how the corporation operated and the individual defendant's relationship to that operation." Id. In determining whether to pierce the corporate veil, courts should look at a number of factors including:

> insufficient capitalization for purposes of corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation at time of transaction in question, siphoning of funds by dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records, and existence of corporation as merely facade for individual dealings.

Id. Additionally, veil piercing "requires not only that a number of these factors be present, but also that there be an element of injustice or fundamental unfairness." Id.

T3 argues that Synesi was merely an alter ego and instrumentality created so that Miley and Olish could receive a salary and for the purpose of enabling Knoblach to foreclose on his interest and obtain the patents. There is no evidence that Synesi failed to observe corporate formalities, failed to pay dividends, failed to keep corporate records, or that there was a siphoning of funds by the dominant shareholder, Knoblach. Although Synesi owed a large outstanding debt to Knoblach at the time of the negotiations with Hogan, the debt was in the form of a bridge loan to enable Synesi to pursue its patents and a return on the process it was developing. See Ass'n of Mill & Elevator Mut. Ins. Co. v. Barzen Int'l, Inc., 553 N.W.2d 446, 450 (Minn. Ct. App. 1996) (finding that insufficient capitalization and insolvency at the time the debts were incurred did not, without more, warrant veil piercing). Finally, while T3 suggests that Miley and Olish failed to perform their jobs and merely had positions so that they could collect salary, it can point to no evidence to support this assertion. Additionally, a six-month budget starting in April 2004 shows a $63,000 salary for Olish and a $48,000 salary for Miley –

salaries not unusual for a president and CEO of a start-up company, especially given the potential for a large return on the patents. Parker Aff. Ex. 22. For these reasons, piercing the corporate veil and holding Miley and Olish individually liable on the breach of contract and promissory estoppel claims is inappropriate.[3]

**C.     Breach of Contract**

The parties do not dispute that they never executed a formal license agreement. Thus, the issue is whether the written and oral representations by Miley and Olish in their negotiations about a licensing agreement created an enforceable contract. A contract requires a meeting of the minds on all essential elements. Minneapolis Cablesystems v. City of Minneapolis, 299 N.W.2d 121, 122 (Minn. 1980). Under Minnesota law, an agreement is unenforceable when it evidences nothing more than an intention to negotiate in the future. Hanson v. Phillips Beverage Co., 487 N.W.2d 925, 927 (Minn. Ct. App. 1992). A letter of intent may be binding, however, if the parties manifest an intent to be bound and the letter contains all essential terms. Metro Office Parks Co. v. Control Data Corp., 205 N.W.2d 121, 125 (Minn. 1973).

T3 argues that a contract was formed on July 29, 2004 when Hogan sent an email to Olish summarizing the agreement and the parties' understandings. The July 29 email discusses an exclusive licensing agreement between T3 and Synesi for the rights to Synesi's bonding and insuring process patents. Parker Aff. Ex. 26. The email states that in consideration for an exclusive license, Synesi "will receive an *as yet to be determined* royalty per transaction." Id. (emphasis added). Also, the email commits T3 to funding the project "*pending* a proposal

---

[3] Even if the Court were to pierce the corporate veil, Miley and Olish would be entitled to summary judgment for the reasons discussed on the other claims.

defining the structure of the project." (emphasis added).  Hogan also wrote it was understood that "by committing to this funding, again *pending further negotiations*, [T3] and or [] Hogan individually, has exclusive rights to this project for a term not to exceed 180 business days from the date of this memorandum."  Id. (emphasis added).  The abundance of qualifying language in this email from Hogan runs contrary to manifesting an intent to form a contract in the email itself.

Synesi also argues that no contract was formed because there was no meeting of the minds between the parties.  Specifically, Synesi argues the email fails to contain two essential terms: (1) the price T3 would pay for the license, and (2) the specific circumstances under which the licensing agreement could be terminated or the process for doing so.

Price may be an essential term to a contract, and the failure for the parties to agree on a price can indicate there was no meeting of the minds.  Van Meeruwen v. Swenson, 141 N.W. 112, 113 (Minn. 1913).  Nonetheless, a contract may be formed if a price could be supplied by either the context of the negotiations or by fixing it to a market price at some point in the future. Id.  When asked in his deposition whether the parties reached an agreement about the price that T3 would pay for the license, Hogan responded that they did not "because [T3] as we moved forward was asked to incur more and more costs associated with commercializing the product, the service."  Hogan depo. at 104.  Hogan also called the price a "moving target."  Id.  This testimony indicates both that the parties had not agreed on a price and that the price was an area of concern between the parties.  Moreover, given the fact that Synesi was providing a unique product, it would be impossible for the Court to supply this term based on a market price.

After Miley and Olish filed their motion for summary judgment on October 21, 2008,

9

Hogan filed an affidavit stating, "[p]er our agreement, Synesi would receive a per transaction royalty for each transmission. We agreed that Synesi would receive a royalty in the 10% to 15% range for each transmission; however, being that early in the marketing process, it would have been premature to assign an exact percentage." Hogan Aff. of Nov. 17, 2008 ¶ 8. In Herring v. Canada Life Assurance. Co., the Eighth Circuit explained that, "a party cannot create a 'sham' issue of fact in an effort to defeat summary judgment by filing an affidavit directly contradicting prior deposition testimony." 207 F.3d 1026, 1030 (8th Cir. 2000) (quoting Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1365-66 (8th Cir. 1983)). A limited exception exists if a subsequent affidavit "explain[s] certain aspects of the deposition testimony or where the prior testimony reflects confusion on the part of the witness." Herring, 207 F.3d at 1030-31. Here, by contrast, Hogan's deposition testimony was clear and unambiguous. He twice testified that the parties had not reached an agreement on price, and the first mention of a 10% to 15% royalty range occurred in a post-motion affidavit responding to Miley and Olish arguing that there was never a meeting of the minds. The Court will not consider Hogan's affidavit and finds that there was no meeting of the minds on the essential element of price. Therefore, no contract was formed between the parties and the Court grants Miley and Olish's motion for summary judgment on the breach of contract claim of Count I.

**D.     Promissory Estoppel**

T3 argues that its interactions with Miley and Olish pursuing an exclusive license to market Synesi's patented technology support a claim for promissory estoppel. Promissory estoppel is "an equitable doctrine that implies a contract in law when none exists in fact." Martens v. Minnesota Min. & Mfg. Co., 616 N.W.2d 732, 746 (Minn. 2000). To prove a

promissory estoppel claim, a plaintiff must show that "(1) a clear and definite promise was made, (2) the promisor intended to induce reliance and the promisee in fact relied to his or her detriment, and (3) the promise must be enforced to prevent injustice." Id.

Because the parties never agreed to a price, the July 29 email was not a clear and definite promise. See Debron Corp. v. National Home Const. Corp., 493 F.2d 352, 357 (8th Cir. 1974) (finding that a lack of a definite price defeats a claim of promissory estoppel). Additionally, the parties' later communications demonstrate that the promise was not definite. On both August 17 and 20, Hogan sent Olish emails discussing the need to obtain a final agreement on the licensing arrangements and refers to the agreement as merely a "draft." Olish responded on October 15 with an email marked "confidential draft." Parker Aff. Ex. 36. In bold letters at the top it reads, "not for use by any party for any reason." Id. The letter refers to "recent discussions regarding T3 and its strategic relationship with [Synesi]." Id. The letter discusses insurance, patent, and pilot program issues and concludes by stating that all issues "need to be finalized prior to a licensing agreement being completed." Id. Hogan, himself, characterized this email as "*an attempt* to finalize the agreement." Hogan depo. at 86 (emphasis added). The emails and Hogan's testimony demonstrate that there was never a clear promise as to a licensing agreement. Rather, the communications between T3 and Synesi were negotiations over a potential licensing agreement. See Moorhead Const. Co., Inc. v. Lien Const., Co., No. CX-93-2161, 1994 WL 284970, at *3 (Minn. Ct. App. June 28, 1994) (finding that a lack of mutual assent between the parties foreclosed a promissory estoppel claim). Because there was never a clear and definite promise made to T3 by Synesi or Miley and Olish, summary judgment is granted on the promissory estoppel claim.

**E.     Fraud**

In its Complaint, T3 alleges that "[d]espite the fact that [Miley and Olish] knew no patent had been granted, [they] repeatedly assured Mr. Hogan that the Synesi technology was fully patented and that [] T3 would be granted a license to sell it." Compl. ¶ 52. T3 argues this constitutes fraudulent misrepresentation and/or omission. To prove fraudulent misrepresentation, a plaintiff must show:

> (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffered pecuniary damage as a result of the reliance.

Hoyt Properties, Inc. v. Prod. Res. Group, L.L.C., 736 N.W.2d 313, 318 (Minn. 2007). To prove fraudulent omission, T3 must also show that Miley and Olish were under a duty to disclose. Baer Gallery, Inc. v. Citizen's Scholarship Found. of Amer., Inc., 450 F.3d 816, 821 (8th Cir. 2006). Such a duty may exist when "one party has special knowledge of material facts to which the other party does not have access." Id. Corporate officers can be found liable for fraud if they directly engage in the fraudulent conduct. State by Humphrey v. Alpine Air Prod., Inc., 490 N.W.2d 888, 898 (Minn. Ct. App. 1992). Finally, a "representation or expectation as to future acts is not a sufficient basis to support an action for fraud merely because the represented act or event did not take place." Vandeputte v. Soderholm, 216 N.W.2d 144, 147 (Minn. 1974).

T3 has presented no evidence that Miley and Olish represented to T3 or Hogan that Synesi possessed the patent. The only information in the record that arguably is a representation by either Miley or Olish about the patent is the October 15 email from Olish that the "business

and technology components of the process are in the final stages of development." Parker Aff. Ex. 36. There is also no evidence that Miley or Olish represented that T3 would have an exclusive license to Synesi's patents because the parties never concluded their negotiations.

Finally, the alleged misrepresentation is not actionable because there is no evidence of T3 suffering pecuniary damages caused by reliance on a representation. See Martens, 616 N.W.2d at 747 (holding that a misrepresentation must be the proximate cause of the damage). On September 29, Hogan, on behalf of T3, entered into a funding agreement with Seaside Investments for $6 million. Id. ¶ 17. Through this agreement, T3 transferred 11,000,000 shares of T3 stock to Seaside in exchange for $6 million in tradable Seaside stock that T3 could sell to raise funds. Id. The plan was for the funds to be held by an escrow agent and not issued until the listing for Seaside was approved by the London Stock Exchange. Parker Aff. Ex. D (McClory depo.) at 14. Seaside failed to list its shares on the London Stock Exchange. Id. at 15. Because Seaside failed to list its shares on the London exchange, a necessary condition for the agreement, the causation element is not satisfied. For these reasons, T3's fraud claim fails.

T3 included in its opposition memorandum a number of other allegedly fraudulent actions by Miley and Olish that had not been previously raised. See Pl.'s Mem. in Opp'n to Summ. J. [Docket No. 108] at 30-32. Federal Rule of Civil Procedure 9(b) requires that when alleging fraud, "a party must state with particularity the circumstances constituting fraud or mistake." "This requirement is designed to enable defendants to respond specifically, at an early stage of the case, to potentially damaging allegations of immoral and criminal conduct." BJC Health Sys. v. Columbia Case Co., 478 F.3d 908, 917 (8th Cir. 2007). These new allegations by T3 were not pled in the original Complaint nor were they pled in either of the subsequent

amended Complaints. Their late arrival to the lawsuit is prejudicial to Defendants.

For these reasons, Miley and Olish's Motion for Summary Judgment is granted on the fraud claim.[4]

**F.      Real Party in Interest**

Miley and Olish renew their objection under Federal Rule of Civil Procedure 17(a) that T3 is not the real party in interest in this action under Federal Rule of Civil Procedure 17(a). While there remains some confusion as to how T3 in its current form received control of the interest to this lawsuit, the Court need not address this issue because all claims against Miley and Olish have now been dismissed.

---

[4] The claims against Miley would also fail because T3 has presented no evidence that Miley engaged in any communications related to the formation of the alleged contract, made a promise that would serve as the basis of promissory estoppel, or misrepresented or omitted relevant information to T3. T3 relies on conclusory allegations that because Miley was CEO of Synesi, he therefore must have been aware of the alleged acts or is liable on the basis of failing to correct any omissions. The vast majority of communication between the parties occurred between Olish and Hogan. Miley's only communications with Hogan were at the initial meeting in June and a meeting in October. Olish had no duty to inform Miley about each communication and did not report to Miley on a regular basis about the on-going negotiations. Miley depo. at 92-93. Because T3 has failed to present any evidence of Miley's involvement in the events surrounding the breach of contract, promissory estoppel, and fraud claims, he is entitled to summary judgment.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants Tim Olish and Rod Miley's Motion for Summary Judgment [Docket No. 95] is **GRANTED**.

.

BY THE COURT:

    s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: March 18, 2009.